**ATTACHMENT C**

**AFFIDAVIT**

STATE OF WEST VIRGINIA )
)
COUNTY OF CABELL )

I, Sean McNees, being first duly sworn, do hereby depose and state as follows:

**BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a black Apple iPhone bearing Model # A1660, FCCID: BCG-E3085A, and IC: 579C-53085A, which is currently in law enforcement possession, and the extraction from that wireless telephone of electronically stored information described in Attachment B.

2. I am currently employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF") and have been so employed since January of 2016. I am assigned to ATF's Charleston, West Virginia, Field Office. I graduated from a ten (10) week criminal investigator training course at the Federal Law Enforcement Training Center, where the course of study dealt with basic criminal investigation techniques. In addition, I graduated from the twelve week (12) ATF National Academy, where a portion of the course of study dealt with violations of federal firearms laws, federal explosives laws,

bomb scene investigation and arson investigation. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).

3. I have investigated cases involving firearms-related offenses, arson, crimes of violence, crimes involving individuals conspiring to obtain or use firearms to commit felony offenses, the illegal sale, possession and use of firearms during the commission of these criminal acts, as well as the use, distribution, and possession of illegal controlled substances. I have utilized cooperating individuals to make controlled purchases of firearms and drugs. I have experience and specific training related to the identification of firearms and ammunition, and the function of firearms and destructive devices. I have training and experience that has made me familiar with the appearance, packaging, paraphernalia and distribution of controlled substances such as, cocaine powder (HCl), cocaine base (crack), heroin, marijuana, LSD, opioid and other pharmaceuticals, methamphetamine and other commonly used street drugs. I am also familiar with tactics utilized by firearms traffickers, and illegal possessors of firearms to distribute, acquire, maintain and possess illegal firearms.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

4. The property to be searched is a black Apple iPhone bearing Model# A1660, FCCID: BCG-E3085A, and IC: 579C-53085A

(hereinafter "the target telephone). The target telephone is currently in the possession of the Huntington Police Department in Huntington, West Virginia.

5. The applied-for warrant would authorize the forensic examination of the target telephone for the purpose of identifying electronically stored data more particularly described in Attachment B.

**PROBABLE CAUSE**

6. I am familiar with the facts surrounding this investigation involving the conspiracy to distribute heroin and/or fentanyl, the distribution of heroin and/or fentanyl, and the possession with intent to distribute heroin and/or fentanyl, by Vernon MITCHELL (hereinafter "MITCHELL"), based on personal observations and information provided to me by members of the Huntington Violent Crime Drug Task Force (hereinafter "HVCDTF") and other law enforcement officers. This affidavit contains facts necessary to establish probable cause in order to obtain a search warrant for the target telephone obtained on December 10, 2019, during the arrest of MITCHELL, and does not include every detail and fact known to your affiant regarding this investigation.

7. On or about September 20, 2019, members of the HVCDTF communicated with a confidential informant (herein after "the CI") who has provided corroborated information regarding drug trafficking in this district. The CI stated that they knew of a

heroin dealer by the name of "Gino" who distributes heroin in Huntington, West Virginia. The CI was shown an unmarked photograph of MITCHELL and the CI identified the photograph as "Gino". The CI stated that MITCHELL was driving around in the Huntington area in a small green sedan.

8.  On September 25, 2019, members of the HVCDTF were conducting mobile surveillance in Huntington. During surveillance, investigators observed a green 2011 Ford Fiesta bearing temporary Ohio registration as it was parking at the rear of the apartments located at 438 5th Avenue. MITCHELL was observed as he exited the vehicle and walked towards the eastern side entrance of the apartments. Investigators subsequently observed MITCHELL exit the eastern most door of the apartments, 438 1/2 5th Avenue, and enter the green Ford Fiesta.

9.  On October 2, 2019, members of the HVCDTF conducted a controlled purchase of suspected heroin/fentanyl from MITCHELL in Huntington. On that date, investigators met the CI and the CI placed a recorded telephone call to MITCHELL. During the call, the CI asked if he/she could see MITCHELL and told MITCHELL he/she had $300. MITCHELL also asked the CI if he/she had a scale he/she could bring. The CI placed a second call to MITCHELL and told him that he/she had a scale and was ready to meet to conduct the transaction. Investigators then provided the CI with $300 of pre-recorded currency and an audio/video recording device.

Investigators also established surveillance in the area of West 14th Street and Madison Avenue in Huntington. In that area, investigators observed a Ford Taurus arrive and the CI entered the vehicle. Inside of the vehicle, MITCHELL distributed a suspected heroin/fentanyl mixture to the CI in exchange for the $300 in currency. During the transaction, MITCHELL utilized the CI's digital scale to weigh the suspected heroin/fentanyl mixture. Once the transaction was completed, the CI met with investigators and turned over the audio/video recording device and the suspected heroin/fentanyl mixture. The suspected heroin/fentanyl mixture was transported to the Huntington Police Department where it was found to weigh approximately 5 grams with the packaging.

10. On October 3, 2019, members of the HVCDTF interviewed a cooperating witness (herein after "CW1") at the Huntington Police Department. CW1 provided corroborated information regarding MITCHELL. CW1 advised that he/she knew of a male from Detroit, Michigan that he/she knew as "Keno" who residing with a female by the name of "Tosha." CW1 was shown an unmarked photograph of MITCHELL and CW1 identified the photograph as "Keno." CW1 described the address where MITCHELL was residing. CW1 was shown an image of 438 5th Avenue in Huntington and confirmed that it was the address that he/she was describing. CW1 stated that the entrance door to MITCHELL's apartment was located on the east side of the structure, which is addressed as 438 1/2 5th Avenue, and

was on the second floor. CW1 further stated that he/she had previously observed a large quantity of a white powder/chunky substance believed to be heroin at the apartment and had observed MITCHELL with a firearm in the past.

11. On October 28, 2019, members of the HVCDTF conducted a controlled purchase of suspected heroin from a white female identified as Tosha ADKINS (hereinafter "ADKINS") in Huntington. On that date, investigators met the CI and the CI placed a recorded telephone call to MITCHELL to arrange the transaction. MITCHELL confirmed that the transaction would occur in the area of 13th Street and 4th Avenue in Huntington. The CI was subsequently met by ADKINS at that location and ADKINS distributed a quantity of suspected heroin/fentanyl to the CI in exchange for $100. Once the transaction was completed, the CI met with investigators and turned over the audio/video recording device and the suspected heroin/fentanyl mixture. The suspected heroin/fentanyl mixture was transported to the Huntington Police Department where it was found to weigh approximately 1.7 grams with the packaging. After the controlled purchase was completed, investigators continued to surveil ADKINS and she was approached by a uniformed Huntington Police Officer. During the interaction, ADKINS provided the officer with an address of 438 5th Avenue in Huntington. Investigators continued to surveil ADKINS and she was observed entering 438 1/2 5th Avenue.

12. On November 7, 2019, members of the HVCDTF and Huntington Police Department SWAT team executed a search warrant at MITCHELL's apartment located at 438 1/2 5th Avenue in Huntington. During the execution of the warrant, MITCHELL, ADKINS, and Andrea Ross were located in the apartment and were arrested. During the search, investigators located over $10,000 in US currency, a firearm, digital scales, multiple cellular telephones, and an empty container of Inositol powder, a common cutting agent used in the processing of heroin and/or fentanyl prior to distribution. After arriving at the Huntington Police Department, investigators also recovered approximately 6.73 grams of a substance from ADKINS which she had concealed in her groin area and stated was heroin.

13. Investigators with the HVCDTF later conducted a digital forensics extraction of the cellular telephone suspected to be used by MITCHELL seized on November 7, 2019. Investigators located numerous messages preserved on the cellular telephone where the individuals were communicating in regards to purchasing and distributing narcotics.

14. On November 8, 2019, members of the HVCDTF were in the area of 438 5th Avenue when they observed an individual (hereinafter "CW2") walk onto the front porch of the structure. Investigators made contact with CW2 who advised that he/she knew MITCHELL. CW2 the agreed to be interviewed at the Huntington Police Department. During the interview, CW2 advised that he/she

knew MITCHELL was a "dope" dealer and, that on numerous occasions, he/she had placed money that was given to him/her onto financial transaction cards at the direction of MITCHELL. CW2 further stated that approximately two weeks prior, MITCHELL provided him/her with a large sum of US currency that CW2 believed to be $20,000. CW2 advised investigators that between MITCHELL's arrest on November 7, 2019, and the date of the interview, the money was stolen.[1] CW2 advised that MITCHELL had since been released from jail and had been texting and threatening him/her to have the money returned.

15. On November 9, 2019, investigators reviewed a digital forensics extraction of CW2's cellular telephone and observed text messages in which CW2 was discussing the money provided to him/her by MITCHELL with another individual. Investigators also observed text message which CW2 identified as being from MITCHELL in which MITCHELL was questioning CW2 regarding the money and threatening CW2 to have the money returned.

16. On December 10, 2019, MITCHELL was arrested for the distribution of heroin and/or fentanyl which occurred on October 2, 2019. During MITCHELL's arrest, he was found to be in possession of $1458.00 in US currency and the target telephone. It is common in my training and experience that drug traffickers

---

[1] Investigators later discovered that, although the money had not been returned to MITCHELL, CW2 falsely advised investigators it had been stolen during the interview.

commonly carry or maintain large amounts of US currency which constitute proceeds from drug distributions. The amount of US currency that MITCHELL was in possession of during his arrest is believed to be drug proceeds due to the fact MITCHELL does not have any identifiable legitimate employment and the continuing nature of MITCHELL's criminal activities through the course of the investigation.

17. I know that the target telephone has been stored at the Huntington Police Department in Huntington, West Virginia, in a manner in which its contents are in substantially the same state as they were when the target telephone first came into the possession of investigators.

18. Based on my experience, I have learned the following from my involvement in controlled substance investigations:

a.) It is common for unlawful distributors of controlled substances to use their cellular telephones to send and receive text messages with other distributors and/or customers and maintain contact lists within their cellular telephones to facilitate their unlawful drug activities;

b.) It is common for unlawful distributors of controlled substances to use their cellular telephones for the following reasons, which include: 1) to arrange unlawful drug transactions; 2) to facilitate unlawful drug transactions; and 3) to communicate with other members of their unlawful drug

organizations concerning matters related to their unlawful drug activities;

  c.) It is common for unlawful distributors of controlled substances who reside in metropolitan areas to travel to the Southern District of West Virginia ("SDWV") and engage in unlawful drug trafficking. Unlawful distributors of controlled substances engage in these activities for several reasons, including: 1) Often the value of a street level quantity of illegal drugs sold in the SDWV is greater than the equivalent quantity of unlawful drugs if sold in their cities of residence; and 2) The perception that law enforcement is not as well trained and equipped in the SDWV to enforce illegal drug laws in relation to law enforcement in the unlawful drug traffickers' cities of residence;

  d.) It is also common for unlawful distributors of controlled substances who transport unlawful drugs from metropolitan areas to the SDWV to frequently make trips to those metropolitan areas in order to obtain additional quantities of unlawful drugs which they transport and sell in the SDWV. Often these unlawful distributors of controlled substances will solicit other members of their drug organizations to transport such drugs on their behalf;

  e.) It is common for unlawful distributors of controlled substances to coordinate with their source(s) of supply and other members of the drug organization through the use of cellular

telephones. Cellular telephones are particularly valuable to unlawful distributors of controlled substances to facilitate their unlawful activities because of a common belief that law enforcement has greater difficulty "tracking" cellular telephones and monitoring conversations over cellular phones than traditional land-line phones. In addition, cellular telephones can be disposed of easily and this fact emboldens unlawful distributors of controlled substances to use such portable devices to facilitate their unlawful activities. This is particularly true in cases when the "source" city where the controlled substances are obtained is different than the city where the controlled substances are distributed. In such cases, based on the distance between the source city and the distribution areas, members of the organization generally cannot meet at a common destination and engage in face-to-face conversations to coordinate and conduct drug-related business;

  f.) It is common for unlawful distributors of controlled substances to store persons' names and their corresponding phone numbers, and addresses of those who are involved in their drug trafficking operations in their cellular telephones' contact list;

  g.) It is common for unlawful distributors of controlled substances to maintain photographs and video on their cellular telephones that capture members of the unlawful drug

organization; members of the unlawful drug organization in the presence of drug proceeds; and, members of the unlawful drug organization in the presence of firearms used to facilitate their drug trafficking activities. Many of the aforementioned photographs and video are considered "self-aggrandizing" portraits where unlawful distributors of controlled substances pose with United States currency to demonstrate the prosperity of their unlawful drug activities and pose with firearms to demonstrate the "fire-power" they possess to facilitate their unlawful drug activities; and,

       h.) It is common for unlawful distributors of controlled substances to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, as well as notations and records of their drug transactions. This information is maintained by the narcotics traffickers within their residences, or other locations, which they maintain dominion and control over, including cellular telephones.

## **TECHNICAL TERMS**

    19. Based on my training and experience, I know that a wireless telephone (i.e. mobile or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with

other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

20. Based on my training and experience I know that the target telephone has capabilities that allow it to serve as a wireless telephone. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. Based on my knowledge, training, and experience, I know that the Device can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Device. This information can sometimes be recovered with forensics tools.

22. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the target telephone was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the target telephone because:

a.) Data on a wireless telephone can provide evidence of a file that was once on a wireless telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a wireless telephone can also indicate who has used or controlled the wireless telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence;

b.) A person with appropriate familiarity with how a wireless telephone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how a wireless telephone was used, the purpose of its use, who used it, and when;

c.) The process of identifying the exact electronically stored information on a wireless telephone that is necessary to draw an accurate conclusion is a dynamic process. Electronic

evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a wireless telephone is evidence may depend on other information stored on the wireless telephone and the application of knowledge about how a wireless telephone behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant;

d.) Further, in finding evidence of how a wireless telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a wireless telephone.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the target telephone consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire target telephone, that might expose many parts of the target telephone to human inspection in order to determine whether it is evidence described by the warrant

24. Because this warrant seeks only permission to examine the target telephone which is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there

is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night

## CONCLUSION

25. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the target telephone described in Attachment A to seek the items described in Attachment B.

_____
Sean McNees, Special Agent, ATF

Sworn to before me and subscribed in my presence this 9th day of January, 2020.

_____
CHERYL A. EIFERT
United States Magistrate Judge